CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

JAN 11 2017

JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CAROL FORESTER INNES, ) | Civil Action No. 3:15CV00018 |
| Plaintiff, ) | |
| ) | **AMENDED MEMORANDUM OPINION** |
| v. ) | |
| ) | By: Hon. Glen E. Conrad |
| BARCLAYS BANK PLC USA STAFF ) | Chief United States District Judge |
| PENSION PLAN COMMITTEE,[1] ) | |
| ) | |
| Defendant. ) | |

Carol Forester Innes filed this civil action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. The case is presently before the court on the parties' motions for summary judgment. For the following reasons, the court will grant the motion for summary judgment filed by defendant Barclays Bank PLC USA Staff Pension Plan Committee (the "Plan Administrator" or "defendant"), and deny the motion for summary judgment filed by the plaintiff.

## Background

Innes was employed by Barclays Commercial Corporation ("BCC"), a subsidiary of BarclaysAmericanCorporation ("BAC") and Barclays Bank PLC ("Barclays"), from April 1, 1981 to March 1, 1994. On February 28, 1994, BCC was sold to an affiliate of The CIT Group ("CIT"). Upon the sale of BCC to CIT, Innes became an employee of CIT. She remained with CIT until June 28, 1994.

---

[1] The defendant is incorrectly named in the complaint. The docket shall be amended to reflect its correct name.

At the time of the sale, Innes served as the chief financial officer of BCC. In connection with the sale, she and other senior executives (the "BCC Executive Group") received a payment from a special pool of funds in the aggregate amount of $3,500,000, with individual shares ranging from $105,000 to $685,000. Innes' share of the special pool (the "Pool Payment") was $390,000. The only prerequisites to each member's receipt of his or her Pool Payment were (1) successful completion of the sale to CIT, and (2) continued employment with BCC through the time of the sale. The dispute in this case centers on whether the Pool Payment is pensionable under the terms of the applicable pension plan.

As a member of the BCC Executive Group, Innes was a participant in two Barclays-sponsored pension plans: the Restated Retirement Plan for BarclaysAmericanCorporation (the "BAC Retirement Plan") and the BarclaysAmericanCorporation Retirement Restoration Plan (the "Retirement Restoration Plan" or "Plan").[2] The pension plan specifically at issue in this case is the Retirement Restoration Plan.

The Retirement Restoration Plan was designed to supplement the BAC Retirement Plan and to provide retirement income beyond the maximum benefit limitations set by ERISA. See BRCLY000004.[3] With respect to eligibility, computation and payment of benefits, and vesting, the Retirement Restoration Plan incorporates the corresponding provisions of the BAC Retirement Plan. The Retirement Restoration Plan also incorporates the administrative scheme of the BAC Retirement Plan. It provides that the Plan is to be operated under the direction of the Plan

---

[2] These plans have since merged into the Barclays Bank PLC USA Staff Pension Plan and the Barclays Bank PLC Retirement Restoration Plan, respectively.

[3] Citations to "BRCLY" are to the administrative record supplied by the defendant (Docket No. 12-1).

2

Administrator (referred to therein as the Retirement Committee) in accordance with the applicable administrative provisions of the BAC Retirement Plan, and that the Plan Administrator's "decision in any matter involving the interpretation and application of this Plan shall be final and binding." BRCLY000007. Additionally, under § 9.7 of the BAC Retirement Plan, which is incorporated into the Retirement Restoration Plan, the Plan Administrator (referred to therein as the Pension/Thrift Committee) is granted "the exclusive right, power and discretion to interpret any and all provisions of the Plan and to determine eligibility for benefits under the Plan, and to determine all questions of fact that may arise thereunder[.]" BRCLY000093.

The provisions governing the amount of benefits payable to participants under the Retirement Restoration Plan incorporate by reference provisions related to the calculation of pension benefits under the BAC Retirement Plan. See BRCLY000005-6. In turn, the benefits payable under the BAC Retirement Plan are calculated with reference to that plan's definition of "Compensation." That definition was amended in 1992, two years prior to the sale of BCC to CIT. The amendment provided, in pertinent part, as follows:

> Compensation means, for any Employee, the base pay, salary or wages paid to him by the Employer, plus overtime, commissions, bonuses paid through the end of the calendar year in which his Accrued Benefit is determined, Management Incentive Payments (except such payments made during 1983), including salary reduction amounts made pursuant to Section 401(k), Section 125 and Section 129, but shall not include severance pay, stay-pay or retention incentives, directors fees, management incentive payments which were deferred pursuant to a deferred compensation election by the Employee, or any amounts contributed to the Employee pursuant to this Plan or any other benefit plan or program of the Employer (exceptive as herein above stipulated).

BRCLY000245. In July of 1994, the BAC Retirement Plan was further amended to make clear that the Pool Payments were not pensionable. See BRCLY000024 ("Effective as of July 26, 1994, no amount received by a Participant as special pay, stay pay or severance pay, including, but

3

not limited to, any amount paid from any pool of funds created in connection with the sale of Barclays Commercial Corporation, shall be included in the definition of Annual Compensation.").

In May of 1994, John Amato, Barclays' pension administrator, sent Innes and other former BCC executives letters regarding their deferred vested pension benefits under the Restated Retirement Plan and the Retirement Restoration Plan, along with statements containing the benefit calculations for each plan. The amount of "total compensation" on which the Restoration Plan benefits were calculated included the Pool Payments received by the executives. BRCLY000184. Innes was advised that she would receive a monthly benefit of $1,585.84 payable from the Restoration Plan, in addition to a $2,804.58 monthly benefit under the Restated Retirement Plan.

After it was discovered that the Pool Payments had been included in the pension benefit calculations, the BCC executives were sent "revised" letters correcting the error. Innes' "revised" letter, dated August 8, 1994, omitted the monthly benefit under the Restoration Plan, and instead indicated that "[t]he current value of [her] Restoration Plan benefit in the amount of $101.20 will be paid in the form of a total lump sum distribution cash-out." BRCLY000185-186.

In 1996, ten members of the BCC Executive Group filed suit in the United States District Court for the Western District of North Carolina, challenging the determination that their Pool Payments were not pensionable. See Boyd v. Restated Retirement Plan for BarclaysAmericanCorporation, No. 3:96-CV-00341 (W.D.N.C. 1996) (the "Boyd case"). Although Innes was not a party to the lawsuit, she was deposed during the course of the litigation in June of 1997. During her deposition, Innes testified that she was asked to be a plaintiff in the lawsuit but made the "financial decision" not to do so. BRCLY000200. Innes explained that she

4

was younger than many of the other BCC executives, and that "the present value of any additional benefits to [her] didn't warrant the investment of the legal fees for the suit." Id.

On August 30, 2013, the Barclays Pension Service Center sent Innes a letter regarding her pension benefit options, along with the forms that she would need to complete to begin receiving payments effective December 1, 2013.[4] The letter indicated that she was entitled to a $2,804.58 monthly benefit under the provisions of the Barclays Bank PLC U.S.A. Staff Pension Plan. It made no mention of any monthly benefit under the Retirement Restoration Plan.

On September 20, 2013, Innes, through counsel, contacted the Barclays Pension Service Center by letter and requested copies of the BAC Retirement Plan and the Retirement Restoration Plan. Innes also requested an explanation of her pension benefits, including any benefits under the Retirement Restoration Plan. After Innes failed to receive a response to the letter, her attorney sent a second letter to the Barclays Pension Service Center in October of 2013, reiterating the requests made in the earlier letter.

On November 22, 2013, Innes submitted her application for retirement benefits. Innes indicated that she was "expressly reserv[ing] all legal and equitable rights to claim her entitlement to the additional benefit due her under the Retirement Restoration Plan." Pl.'s Suppl. to Administrative R., Docket No. 16 at 18.

On March 5, 2014, Innes filed suit under ERISA, alleging, inter alia, that the named defendants improperly failed to pay benefits due under the Retirement Restoration Plan. See Innes v. Barclays Bank PLC USA Staff Pension Plan, No. 3:14CV00008 (W.D. Va. 2014). The defendants subsequently moved to dismiss that claim under Federal Rule of Civil Procedure

---

[4] The Barclays Pension Service Center is a third party that performs certain ministerial and administrative functions on behalf of the Barclays Bank PLC USA Staff Pension Plan Committee.

5

12(b)(6), based in part upon the plaintiff's failure to exhaust her administrative remedies. On December 1, 2014, the court granted the defendants' motion, and dismissed the case without prejudice to allow the plaintiff the opportunity to satisfy the exhaustion requirement. See Gayle v. United Parcel Serv., Inc., 401 F.3d 222, 226 (4th Cir. 2005) ("An ERISA welfare benefit plan participant must both pursue and exhaust plan remedies before gaining access to the federal courts.").

Prior to the entry of the court's memorandum opinion and order, Innes submitted an application for benefits under the Retirement Restoration Plan. By letter dated January 26, 2015, the Plan Administrator denied Innes' claim for benefits. In so doing, the Plan Administrator explained, in pertinent part, as follows:

> On or about February 28, 1994, you received a special payment in the amount of $390,000. This special payment was expressly payable only upon the successful completion of the sale of your employer, Barclays Commercial Corporation and was offered to retain you as a key executive until the closing of the sale. This special payment also was intended to incent you to contribute fully to the successful closing of the sale of your employer.
>
> The Plan's definition of pensionable compensation is contained in Section 1.3 of the Restated Retirement Plan of the BarclaysAmericanCorporation, Amended and restated January 1, 1989 (the "Retirement Plan"). Section 1.3 of the Retirement Plan specifically excludes from the definition of pensionable compensation "severance pay, stay-pay or retention incentives." Stay pay and retention incentives are used by Barclays in connection with divestitures as a mechanism to retain key members of an executive team during a sale period and the above definition of pensionable compensation reflects Barclays practice of excluding types of compensation that are not generally available to all employees.
>
> You received a letter in May of 1994 from Mr. Amato of Barclays that was an estimate of your Plan benefits (copy enclosed). Due to a clerical error, Mr. Amato incorrectly included your special payment as pensionable compensation for 1994 on the second page of that letter. Upon discovery of the clerical error, Mr. Amato sent you a revised estimate on August 8, 1994 that did not include your special payment as pensionable compensation (copy enclosed).

6

Mr. Amato's second estimate of your Plan benefits is correct because your special payment was a retention incentive or stay-pay and the Plan specifically excludes both types of payments from the definition of pensionable compensation.

BRCLY000181.

Innes appealed the denial of her claim for benefits under the Retirement Restoration Plan. In support of her appeal, Innes argued that the Pool Payment that she received on or about February 28, 1994 was a performance bonus rather than a retention bonus, and that the decision to exclude the bonus from pension calculations was based upon an amendment to the Plan that was not in effect at the time the bonus was paid.

Innes' appeal was denied by letter dated April 2, 2015. In that letter, the Plan Administrator first addressed Innes' argument regarding the applicable definition of pensionable compensation. The Plan Administrator explained that stay pay and retention incentives were excluded from the definition of "compensation" pursuant to an amendment adopted on June 19, 1992, long before Innes received her Pool Payment, and that the purpose of the amendment was to memorialize Barclays' compensation practices with respect to employees critical to the sale of its noncore businesses. BRCLY000242. The Plan Administrator then rejected Innes' argument that the Pool Payment was a performance bonus rather than a retention incentive, explaining as follows:

> Barclays routinely offered stay pay or retention incentives to key employees during a sale period that were paid if the employee remained an active employee until the closing date and the transaction successfully closed. These payments were made to induce key employees to stay with the business until closing to ensure a smooth closing in which Barclays could deliver the business to the purchaser in sound financial and operational condition.
>
> In addition, the characterization of your Payment as a performance bonus is not supported by various discussions among BCC's then President, Mr. Boyd, and the senior management of Barclays North America. Mr. Boyd raised attrition concerns prior to the sale and requested that special payments be made to his executive team on the day of closing conditional only on their employment on that

date. In a memorandum to senior management of Barclays North America, he stated:

> Once the word is in the marketplace, it is going to take everything this management team has to hold the Company together. Market conditions are such that other companies will offer packages that far exceed those presently on the table from Barclays in terms of amounts and certainty of payment . . . .
>
> Each of my senior people are in different situations, personally, and what I believe is in the Bank's interest is to treat them somewhat generously, with clear agreements giving rise to payouts conditional only on employment on the day of closing. If the Bank will do that, in my opinion, the senior management team will do everything that is humanly possible to serve the Bank's interest.

Payouts conditional only on employment on the day of closing are properly characterized as stay pay or retention incentives, not performance bonuses. BRCLY000243.

Innes filed the instant action on April 22, 2015. In her complaint, Innes asserts a claim for benefits under § 502(a)(1)(b) of ERISA, 29 U.S.C. § 1132(a)(1)(B), and a claim for statutory damages under § 502(c)(1)(B), 29 U.S.C. § 1132(c)(1)(B). Innes also seeks to recover, in the event that she prevails on either claim, "other appropriate equitable relief . . . including but not limited to prejudgment interest on past due plan benefits," and "reasonable attorney's fees and costs." Compl. ¶¶ 41-43, Docket No. 1.

In accordance with the court's scheduling order, the parties moved for summary judgment on the plaintiff's claim for benefits. See 6/10/15 Scheduling Order ¶ 5, Docket No. 7 ("All parties are deemed to have moved for summary judgment in their respective favor based upon the administrative record."). The parties then moved for summary judgment on the claim for statutory damages. The motions have been fully briefed and argued, and the matter is now ripe for review.

## Discussion

### I. Claim for benefits

Innes seeks review of the denial of her claim for benefits under the Retirement Restoration Plan, pursuant to § 502(a)(1)(B) of ERISA. That section authorizes a plan participant to bring a "civil action . . . to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

#### A. Standard of Review

Where, as here, an employee benefit plan provides a fiduciary with discretionary authority to determine whether a claimant is entitled to benefits or to otherwise construe the terms of the plan, a district court reviews the fiduciary's decision for abuse of discretion. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110-11 (1989). "Thus, in 'ERISA actions where the plaintiff is challenging the denial of benefits, summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment do not apply.'" Ayers v. Kyanite Mining Corp., No. 3:14-CV-00011, 2015 U.S. Dist. LEXIS 92731, at *9 (W.D. Va. July 16, 2015) (quoting Keith v. Fed. Exp. Corp. LTD Plan, No. 7:09CV00389, 2010 U.S. Dist. LEXIS 37480, at *10 n.4 (W.D. Va. Apr. 15, 2010)). Instead, the court performs a record review to determine whether the plan administrator abused its discretion in denying the plaintiff's claim for benefits. Id.

Under the abuse of discretion standard, the court "will not disturb a plan administrator's decision if the decision is reasonable, even if [the court] would have come to a contrary conclusion independently." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629 (4th Cir. 2010). A decision is reasonable if it is the result of a "deliberate, principled reasoning process" and "supported by

9

substantial evidence." Id. Substantial evidence is that "which a reasoning mind would accept as sufficient to support a particular conclusion." DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011). It consists of "more than a scintilla [of evidence] but less than a preponderance." Donnell v. Metro Life Ins. Co., 165 F. App'x 288, 295 (4th Cir. 2006) (citing LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984)).

The Unites States Court of Appeals for the Fourth Circuit has identified eight nonexclusive factors that a court may consider in reviewing a plan administrator's decision for reasonableness. See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000). Those factors include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Id. Some courts have applied these factors in a piecemeal fashion, see Wasson v. Media Gen., Inc., 446 F. Supp. 2d 579, 591-602 (E.D. Va. 2006) (noting in which party's favor each factor weighed), while others have examined the factors holistically to determine whether the plan administrator's decision was the result of a reasoned and principled process supported by substantial evidence. See DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011).

"When a district court reviews a plan administrator's decision under the abuse of discretion standard, 'an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time.'" Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999) (quoting Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir.

1994)). Accordingly, the court is generally limited to the administrative record and other evidence known to the plan administrator when it rendered the decision under review. Helton v. AT&T Inc., 709 F.3d 343, 352-53 (4th Cir. 2013); see also Brodish v. Fed. Express Corp., 384 F. Supp. 2d 827, 833 (D. Md. 2005) ("Generally, the Fourth Circuit defines the administrative record as those facts known to the administrator at the time the administrator made the benefits eligibility determination."). The burden of proving an abuse of discretion rests with the plaintiff. Atwater v. Nortel Networks, Inc., 388 F. Supp. 2d 610, 617 (M.D.N.C. 2005) (citing Saah v. Contel Corp., 780 F. Supp. 311, 315 (D. Md. 1991), aff'd, 978 F.2d 1256 (4th Cir. 1992)).

### B. Analysis

Upon reviewing the record, the court is of the opinion that the Plan Administrator did not abuse its discretion in denying Innes' request for benefits under the Retirement Restoration Plan. Before discussing the merits of her claim for relief under § 502(a)(1)(B) of ERISA, the court will first address whether the claim was filed within the applicable statute of limitations. For the reasons explained below, the court concludes that it was not timely filed.

#### 1. Statute of Limitations

ERISA, like many federal laws, does not contain a statute of limitations applicable to claims for benefits under § 502(a)(1)(B). White v. Sun Life Assurance Co. of Canada, 488 F.3d 240, 245 (4th Cir. 2007). Accordingly, courts "borrow the state law limitations period applicable to claims most closely corresponding to the federal cause of action." Id. Under North Carolina law, which otherwise governs the Retirement Restoration Plan, the three-year statute of limitations applicable to contract actions is the "proper analogy."[5] Singleton v. Temp. Disability Benefits

---

[5] The Retirement Restoration Plan provides that it "shall be construed and enforced in accordance with the laws of the State of North Carolina." BRCLY000008.

11

Plan for Salaried Employees of Champion Int'l Corp. #505, 183 F. App'x 293, 295 n.2 (4th Cir. 2006).

Although the statute of limitations is borrowed from state law, federal law determines the date on which the statute of limitations begins to run. White, 488 F.3d at 245. In most ERISA cases, the limitations period begins to run when a plaintiff may first seek judicial review, after she has exhausted all administrative remedies available under the applicable plan. Id. at 246. Where, however, a plaintiff does not make a timely claim for benefits, appellate courts, including the Fourth Circuit, have recognized "an alternative approach," under which the limitations period begins to run at "the time at which some event other than a denial of a claim should have alerted [the plaintiff] to [her] entitlement to the benefits [she] did not receive." Cotter v. E. Conference of Teamsters Ret. Plan, 898 F.2d 424, 429 (4th Cir. 1990). "Under this approach, 'a formal denial is not required if there has already been a repudiation of the benefits by the fiduciary which was clear and made known to the beneficiary.'" Bond v. Marriott Int'l, Inc., 637 F. App'x 726, 732 (4th Cir. 2016) (quoting Miller v. Fortis Benefits Ins. Co., 475 F.3d 516, 520-21 (3d Cir. 2007)); see also Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan, 201 F.3d 44, 48 (2d Cir. 1999) ("We . . . follow the Seventh, Eighth, and Ninth Circuits in holding that an ERISA claim accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff -- regardless of whether the plaintiff has filed a formal application for benefits."); Morrison v. Marsh & McLennan Cos., 439 F.3d 295, 302 (6th Cir. 2006) ("The rule governing when a cause of action accrues is the 'clear repudiation' rule. This rule provides that when a fiduciary gives a claimant clear and unequivocal repudiation of benefits that alone is adequate to commence accrual, regardless of whether the repudiation is formal or not.").

12

As the Fourth Circuit recently explained, "[t]he 'clear repudiation' rule serves the goals of statutes of limitations, to 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared,' Order of R.R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348-49 (1944), and to encourage 'rapid resolutions of disputes,' Carey, 201 F.3d at 47." Bond, 637 F. App'x at 732. "These goals 'are served when the accrual date anchors the limitations period to a plaintiff's reasonable discovery of actionable harm.'" Id. (quoting Miller, 475 F.3d at 522).

Applying the clear repudiation concept here, the court concludes that Innes' claim for benefits is untimely. Innes was put on notice that her Pool Payment would not be treated as pensionable compensation in August of 1994, when she received a "revised" pension calculation showing that her Retirement Restoration Plan benefit totaled $101.20, and that it would be paid in a lump-sum distribution, less applicable tax withholdings. BRCLY000185-186; see also BRCLY000199 ("[I]t was clear that the . . . numbers in the letter did not reflect the [pool] payment as part of the pensionable base."). By the time Innes received the revised calculation, Innes was already aware of Barclays' position that the Pool Payment would not be treated as pensionable compensation. She indicated during her 1997 deposition in the Boyd litigation that pension issues were "discussed soon after the sale took place." BRCLY000199. Although Innes had the opportunity to join the plaintiffs in the Boyd case, who, like her, took issue with Barclays' position on the Pool Payments, Innes made the conscious decision not to do so, based on her then-existing belief that the value of any additional pension benefits did not justify the cost of litigation. Eighteen years later, when she was close to 65, Innes changed her mind and elected to file suit. While the possibility of additional pension benefits may have become more important to Innes

13

once she reached retirement age, the "[c]ommencement of a limitations period need not . . . await the dawn of complete awareness" on the part of a plaintiff. Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir. 1993). Because any right that Innes had to monthly pension benefits under the Retirement Restoration Plan was clearly repudiated by Barclays in the mid-1990s, her claim for benefits is barred by the applicable statute of limitations.[6]

### 2. Review for Abuse of Discretion

Even if Innes' claim were not time-barred, the court could not find that the Plan Administrator abused its discretion in denying her claim. The decision was supported by the language of the Plan, and the "evidence known to the plan administrator" at the time the decision was made. Helton, 709 F.3d 343, 356 (4th Cir. 2013); see also Donnell v. Metro. Life Ins. Co., 165 F. App'x 288, 294 (4th Cir. 2006) ("As we have noted, judicial review of the reasonableness of [the plan administrator's] decision is limited to the body of evidence before the administrator at the time it rejected [the plaintiff's] claim."). At the time of the sale of BCC to CIT, the operative definition of pensionable "compensation" excluded "stay-pay or retention incentives." BRCLY000245. The Plan Administrator concluded that the Pool Payment made to Innes upon the sale of BCC fell within that category and, thus, was not pensionable. The Plan Administrator's decision was supported by a memorandum from Edward Boyd, the President of BCC, in which he addressed the "attrition risk[s]" associated with the sale of the company, and requested that the "payments be paid on the day of closing, conditional only on employment at that date." BRCLY000266. The decision was also supported by Innes' own deposition testimony, in which she stated that "it was understood that the pool would be payable upon [the] date of sale, but

---

[6] In light of the court's conclusion that Innes' claim for benefits is barred by the statute of limitations, the court need not decide whether the defense of laches applies to this claim.

14

beyond that condition, there were no other qualifying conditions attached." BRCLY000197. Payments that are conditional only on continued employment through the date a company is sold are rationally characterized as stay pay or retention incentives, and the Plan Administrator operated well within its discretion in classifying them as such. Moreover, the Plan Administrator's decision in this regard was consistent with earlier interpretations of the Plan, including those that gave rise to the Boyd case. Accordingly, denying Innes' claim for benefits was a reasonable decision based on the information available.

The court is not persuaded by Innes' criticism of the materials reviewed by the Plan Administrator. In particular, Innes takes issue with the fact that the Plan Administrator considered a memorandum prepared by counsel in the Boyd case regarding that lawsuit. Given the similarities between the two cases, however, someone had to summarize the Boyd litigation for the Plan Administrator. Since the case was litigated nearly twenty years ago, it was not unreasonable for Barclays' current counsel, who also served as counsel of record in the Boyd case, to be the one to do so. The court likewise rejects Innes' argument that a conflict of interest tainted the Plan Administrator's decision here. It is undisputed that a structural conflict does exist, since the Plan Administrator "both evaluates claims for benefits and pays benefit claims." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). However, a conflict of interest is "but one among many factors in determining the reasonableness of the [Plan Administrator's] discretionary determination." Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008); see also Piepenhagen v. Old Dominion Freight Line, Inc., 640 F. Supp. 2d 778, 785 (W.D. Va. 2009) ("[E]ven if the administrator is acting under a conflict of interest," the court "must continue to apply a deferential standard of review while weighing the conflict as a factor in determining whether there is an abuse of discretion.") (citation and internal quotation marks omitted). As

15

Case 3:15-cv-00018-GEC   Document 44   Filed 01/11/17   Page 15 of 19   Pageid#: 822

discussed above, the court finds that the Plan Administrator's decision to deny Innes' claim for benefits was reasonable. The court is not persuaded that the presence of a structural conflict improperly influenced that decision.

For these reasons, the court concludes that the defendant is entitled to summary judgment on the claim for benefits under §502(a)(1)(B) of ERISA. The court will grant the defendant's motion for summary judgment on this claim and deny Innes' motion for summary judgment.

## II. Claim for statutory damages

Innes also seeks to recover statutory damages as a result of the delay in responding to her requests for retirement plan documents. This claim is brought pursuant to § 502(c)(1) of ERISA, which provides, in pertinent part, as follows:

> Any administrator . . . who fails or refuses to comply with a request for information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1). For the following reasons, the court finds that Innes is not entitled to statutory damages.

Under the plain language of § 1132(c)(1), civil penalties can only be imposed upon an "administrator" who fails or refuses to comply with a request for plan documents. Id.; see also Flores v. Life Ins. Co. of N. Am., 770 F. Supp. 2d 768, 773 (D. Md. 2011). ERISA defines the "administrator" as "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be

16

identified, such other person as the Secretary may by regulation prescribe." 29 U.S.C. § 1002(16)(A).

In this case, Innes directed her initial requests for plan documents, to which she did not receive a timely response, to the Barclays Pension Service Center ("Service Center"), a third party that performs certain ministerial and administrative functions on behalf of the defendant. It is undisputed that the Service Center is not the designated plan administrator. Innes nevertheless argues that an award of statutory damages is appropriate because the Service Center served as a "de facto" administrator.

"The Fourth Circuit has not yet endorsed the 'de facto' administrator doctrine, although some other Circuits have done so." Flores, 770 F. Supp. 2d at 773 (citing Rosen v. TRW, Inc., 979 F.2d 191, 193-94 (11th Cir. 1992); Law v. Ernst & Young, 956 F.2d 364, 373-74 (1st Cir. 1992)). Instead, the Fourth Circuit has held that the "administrator" under an ERISA plan is the entity defined as such by ERISA, and that an entity does not become a plan administrator simply because it has certain "administrative responsibilities." Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 62 (4th Cir. 1992); see also Sentara Va. Beach General Hosp. v. LeBeau, 182 F. Supp. 2d 518, 526 (E.D. Va. 2002) (declining to apply the "de facto" administrator doctrine, and holding, under Coleman, that a court cannot impose an administrator's statutory duties on another entity unless that entity meets the statutory definition of "administrator"). In the absence of any authority compelling it to do so, this court, like other district courts in the Fourth Circuit, declines to adopt the "de facto" administrator doctrine. Accordingly, any actions or omissions on the part of the Service Center, the entity to whom the unanswered requests for documents were addressed, do not give rise to a claim for statutory damages under § 502(c)(1).

Moreover, even if a statutory penalty could be assessed on the basis of the Service Center's failure to respond to document requests, the court is of the opinion that such penalty is not warranted in the instant case. In determining whether to impose a statutory penalty, courts consider several factors including (1) "prejudice to the plaintiff"; (2) "the nature of the administrator's conduct in responding to the participant's request for plan documents" and (3) "frustration, trouble, and expense" incurred by the plaintiff. Davis v. Featherstone, 97 F.3d 734, 738-39 (4th Cir. 1996). On balance, these factors weigh against an award of damages here. Once Innes' request for plan documents actually made its way to the defendant, the documents were produced in a timely manner, and Innes has not shown that she suffered any prejudice from not receiving them sooner. Innes had already retained counsel at the time she initially requested the documents from the Service Center, and she would have inevitably had to file suit under ERISA to pursue her claim for benefits, in light of the defendant's position that her Pool Payment was not pensionable. While the court recognizes that Innes may have experienced frustration as a result of the delay in receiving copies of the requested plan documents, her need for new copies resulted from her nearly twenty-year delay in asserting her entitlement to benefits under the Retirement Restoration Plan. Indeed, Innes herself acknowledges that she no longer had copies of the documents because of the passage of time.

For these reasons, the court declines to award statutory damages under § 1132(c)(1). The defendant's motion for summary judgment will be granted with respect to this claim.[7]

---

[7] In light of the court's rulings, Innes is not entitled to equitable relief or attorney's fees and costs. See Compl. ¶ 42 (requesting equitable relief in the form of "prejudgment interest on past due plan benefits"); see also Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 255 (2010) (holding that "a fees claimant must show some degree of success on the merits before a court may award attorney's fees under [29 U.S.C.] § 1132(g)(1)") (citation and internal quotation marks omitted). Accordingly, her requests for such relief must be denied.

18

## Conclusion

For the reasons stated, the court will grant the defendant's motion for summary judgment and deny the plaintiff's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 11th day of January, 2017.

/s/ Glen Conrad
Chief United States District Judge